## UNITED STATES *v.* THE BANK OF THE UNITED STATES.

Under no circumstances can a supplemental answer be permitted to be filed, after the evidence has been concluded.

To prove the reversal by the Supreme Court of the United States of a judgment obtained in a Circuit Court, defendants offered in evidence a printed copy of the record of the suit in the Supreme Court certified by the clerk of the Circuit Court, under the seal of his court, to be a true copy of the record and the proceedings of the Circuit Court in the action ; and a copy of the mandate of the Supreme Court, reversing the judgment below, and remanding the case for further proceedings, also certified by the clerk of the Circuit Court, under the seal of his court, to be a true copy of the original on file in his office. There was no copy of the judgment of the Supreme Court among the papers offered in evidence. On an exception to the evidence : *Held,* that it was inadmissible, there being no proof that the person who signed as clerk of the Circuit Court was clerk of that court, and the record not being authenticated as required by the act of Congress of 26 May, 1790.

The courts of this State are not bound to know the clerks of the courts of the United States in other States ; nor will any greater weight or authority be given to their certificates and official acts, than to those of the clerks of the state courts of such States.

Want of jurisdiction, *ratione personæ,* cannot be pleaded by a party who has voluntarily submitted to the jurisdiction of the court.

The law designates who the judicial sequestrator shall be, and the court cannot appoint another, unless by consent of parties. The parties to an action may select their own agents, and confer on them such powers as they think proper ; but the court can impose no burdens or restrictions on such agents, not imposed by their principals.

APPEAL from the Commercial Court of New Orleans, *Watts,* J.

GARLAND, J. In January, 1842, the United States commenced a suit, by attachment, in the Commercial Court, against the

Bank of the United States, to recover a very large amount of money.   Among other claims which the plaintiffs set up against the defendants, in their suplemental petition, it is alleged, that they had, in an action brought by them against said corporation, in the Circuit Court of the United States, in the third circuit, sitting at Philadelphia, obtained a verdict and judgment against the defendants, for the sum of $251,243 54, with interest, "as will more fully appear by the annexed duly authenticated transcript of the record in said action made part hereof, and by other evidence, if necessary, to be adduced on the trial of this cause."

During the pendency of the suit, for reasons stated in the case of *Frazier et al.* v. *Wilcox et al.* (4 Robinson, 521), Frazier and Adams were, by consent of parties, named receivers, to take into possession the assets and property attached, and to collect the same, according to an agreement entered upon the minutes of the court.   These persons accepted the agency, and this court, in the case cited, said: "To us it appears, that the plaintiffs" (who were the said Frazier and Adams) "stand in the relation of agents to the United States, the Bank of the United States, and the assignees of the latter, and as such they can sue," &c.   In the same opinion this court said, that the capacity of the agents, or receivers, was derived from the assent of the parties, and not from the authority or appointment of the judge of the Commercial Court.   4 Robinson, 525.   He had no more authority over them, than the agreement of the parties conferred. Whether the parties interested have ever terminated the agency of the receivers, it is not material now to enquire.

In August, 1842, whilst the case was pending, an agreement was made between the counsel for the plaintiffs and defendants, by which the latter were not " to apply to the court for a continuance, in order to await the decision of the Supreme Court of the United States, upon the writ of error now pending therein between the same parties, from the Pennsylvania Circuit, &c ; and in consideration thereof, that the said United States shall, in the event of a reversal of said judgment, enter a *remittitur* for so much of said judgment (if any) obtained by them in this court, as shall give the said defendants the full benefit of

such reversal." Under this agreement the parties went to trial, and on the production of the record of the case of the United States against the Bank of the United States, and the judgment rendered therein by the Circuit Court of the United States of the third circuit, sitting in Pennsylvania, a sum of $251,243 54, with legal interest, was allowed the plaintiffs, and contributed largely to the aggregate of the judgment obtained by them. This suit related to the claim of the United States for certain dividends on its stock in the Bank, and a demand, on the part of the latter, for damages on a bill, or bills of exchange, drawn by the order of a late President of the United States on the French government, and protested for non-payment. The case was then in the Supreme Court of the United States on a writ of error taken by the Bank.

In 1843, the present case being then in this court, on an appeal considered suspensive (consequently no execution could issue in favor of the plaintiffs), and the assets attached and in the hands of the agents, or receivers, Frazier and Adams, being in danger of serious damage and loss, in consequence of the course then being pursued by other attaching creditors, it was proposed by Brooks, the attorney of the Bank of the United States, and the assignees or trustees, claiming to be interested in the assets attached herein :

" 1. That if there is any agreement in existence, restraining the United States from proceeding by execution on their judgment in New Orleans to sell the assets attached, it shall be be considered as abrogated.

" 2. If the United States should purchase the assets of the Bank or trustees, through Wm. W. Frazier and Christopher Adams, Jr., such proceeding shall not in any way affect the rights of the United States to proceed, in Philadelphia, or elsewhere, in suits there pending, or to be brought, for the recovery of the debt demanded by the government, nor shall a greater sum be credited than shall be realised from the assets.

" These stipulations not to be considered as a waiver of any rights of the Bank of the United States, or of any of the trustees, further than is herein expressed."

Upon the receipt of this proposition by the Secretary of the

The United States v. The Bank of the United States.

Treasury, the District Attorney of the United States for the Eastern District of Louisiana, was directed to issue an execution. He produced in court his letter of instructions, and the agreement just stated, also a copy of a letter from the Solicitor of the Treasury to Frazier and Adams, as agents, and asked that a *fieri facias* might be issued forthwith, on the judgment rendered, which was ordered: " but on the suggestion of T. Slidell and J. R. Grymes, attorneys appointed for the defendants and attorneys for the intervenors, it is considered that this order shall not be so construed as to signify a recognition by said defendants or intervenors, of the construction given to the agreement between the parties, by the Solicitor of the Treasury, in the letters and documents filed by the District Attorney."

On the 7th June, 1843, the Solicitor of the Treasury wrote to Messrs. Frazier and Adams, that the District Attorney had been instructed to issue an execution on the judgment in favor of the United States against the Bank, and to levy upon the assets of the defendants in his district, subject to levy and sale. He says that the District Attorney is also instructed to sell those assets, and, if they can be sold at fair prices, to make the amount of the debt, interest and costs, in favor of the United States. " But it is apprehended that, owing to the situation of the assets, a fair price in specie cannot be got for them ; and that if they were sold, and the United States, by an agent, should not become a bidder, they will be sacrificed for a sum much below their value, and insufficient to pay the debt to the United States. To prevent this, I am authorised by the Secretary of the Treasury to request you to accept the appointment, which is hereby conferred, of agents of the United States, to attend the sale on the execution, and purchase in the assets sold, for the United States.

" Should you accept this appointment, you will bid such sums as will prevent a sacrifice of the assets, taking care, in all cases to keep within reasonable bounds, and exercising in regard to each, the sound discretion which a prudent man would exercise in his own case.

" You will assume the care, management and collection of the assets and choses in action, which you may so purchase, in

*trust for the United States,* and convert the same into money as fast as it can be done; and, from time to time, as collections are made, you will pay the same into the Treasury of the United States in payment of their judgment, debt, interest and costs ; and if, after satisfying such judgment, and paying the expenses incurred in your agency and in the collection of such assets, a sum of money should remain, that sum shall be paid into court, to be applied and paid by order of the court to such person or persons as may be legally entitled to the same, as if such funds had not been levied on by the United States, and as if no proceedings had been instituted by, and no debt due to the United States.

" The District Attorney is instructed to co-operate with you in the execution of your agency hereby conferred."

This agency was accepted by Frazier and Adams, without any limitatian or reserve. Neither the bank, nor the assignees, ever gave them any instructions, nor assumed a right to do so.

In the same letter in which the District Attorney was directed to issue the execution, and was informed of the appointment of Frazier and Adams as agents, the Solicitor of the Treasury sends a copy of the propositions of Brooks, and he gives his views of them. The first stipulation he says, removes all obstacles to issuing the execution. " The second stipulation tendered by the Bank and the trustees, looks to the purchase of these assets by the United States, through the agency of Messrs. Frazier and Adams, should the government see fit to take that course, and direct such purchase by such agents. It involves no agreement on the part of the United States so to proceed, or as to the disposition of the assets should they be purchased.

" The primary object of the government is to collect the debt due ; but it considered it but right in doing so, to regard the interests of others, so far as to occasion as little injury to them as practicable."

The Solicitor then proceeds to recapitulate his instructions to the agents, and directs the District Attorney to co-óperate with them. He concludes : " this arrangement is voluntarily made by the Secretary of the Treasury, who desires only the payment of the debt due to the United States ; and who unites with me in

considering it most consistent with equity and justice to all parties concerned."

Under the agreement and instructions stated, the sheriff of the Commercial Court, on the —— day of July, 1843, proceeded to sell under the execution in favor of the United States, a very large amount of assets, consisting of judgments, notes, mortgages, bills, &c. The agents of the United States purchased assets to the amount of about $404,819 36, for the sum of $126,000, which last amount was entered as a credit on the execution. The assets were adjudicated to the United States, and, after the sale, delivered to their agents, who proceeded to collect them. A large amount of other assets was purchased by other persons, and the money paid to the sheriff. It was at first agreed that this money should remain in the hands of the sheriff; but it was afterwards agreed to deposit it in the Bank of Louisiana, subject to the order of the court, until after the appeal pending in the Supreme Court of this State, between the United States and the assignees of the Bank of the United States, before referred to, and the appeal in the Supreme Court of the United States between the Bank and the United States, should be decided.

The first of the above mentioned cases was decided in this court, in June, 1844, and the decision of the inferior court affirmed, whereby the United States were declared to be entitled to receive the whole sum made on the execution; but while the appeal in the one case was pending here, the other had been tried in the Supreme Court of the United States, and the judgment in that case reversed, and a *venire facias de novo* awarded, because of the verdict being erroneous in a matter of law, which judgment was equivalent to a new trial in our jurisprudence.

It may here be stated, that before the judgment and mandate of this court reached the inferior court, the Secretary of the Treasury, or the Treasurer of the United States, drew a draft on Adams and Frazier, the agents, for $2,000, in favor of the Hon. Henry A. Wise, which the latter refused to pay, on the ground that it was a fee to the District Attorney, for extra services, in the suit of the United States against the Bank, then pending, and that the defendants ought not to pay the fee of the attorney

for the plaintiffs. Frazier also assumed the ground, that he was not the agent of the United States, but a trustee for them and the assignees of the Bank, and that he would be responsible to the latter, if he paid the draft. A long correspondence ensued between Frazier and the Solicitor of the Treasury, which resulted in the latter informing the former, that the Secretary of the Treasury had revoked the powers conferred on him, as agent, that in future Adams was to be the sole agent, and that all the assets or money, in his (Frazier's) hands, must be delivered to Adams. Frazier still contended that he was a trustee, and not an agent; and declined giving up his trust, notwithstanding the mandate of the Solicitor.

This discharge of Frazier by the Secretary of the Treasury, led the way for a new set of rules, which ended in the controversy now before us. On the 9th of May, 1844, the counsel for the various trustees, the intervenors in the suit, called Frazier and Adams, " in their capacity of agents of the United States of America, or in whatsoever capacity they may hold any funds or property in litigation, or proceeds in any wise representing any property in litigation in the cause," and the United States, by their attorney, to show cause why the said agents should not be ordered and restrained from disposing of any property or funds in their hands, without a specific order of court providing for such disbursement and appropriation, and that an injunction issue, &c. A plea to the jurisdiction, and an answer was filed by the District Attorney of the United States ; a trial much contested followed, and the judge below, in a very elaborate opinion, made the rule absolute.

It is not necessary to state this part of the case more fully, as there is no appeal from this judgment.

A few days after this rule was taken, the United States sued Frazier in the Circuit Court of the United States for this State, alleging the circumstances of his appointment and removal as agent aforesaid, and his refusal to give up the property and money in his hands ; wherefore they prayed for a judgment restoring to them their money and property so detained, and for $50,000 as damages.

After the decision of this court was given, affirming the judg-

The United States v. The Bank of the United States.

ment in the principal contest between the plaintiffs and the assignees of the Bank, the counsel for the aforesaid assignees and the Bank, in their joint names, suggested to the court that the judgment rendered in the case of the United States against the Bank, in the Circuit Court in Pennsylvania, had been reversed by the Supreme Court of the United States, and a *venire facias de novo* ordered. He further suggested the agreement entered into, in August, 1842, in relation to the remission, in case said judgment was reversed, and filed a copy of it; he therefore asked that the plaintiffs might be cited by their attorney, and that Adams and Frazier, agents, be ordered to show cause why a remission of $251,243 54, with interest thereon from the 20th day of October, 1841, should not be entered upon the judgment so rendered by the Commercial Court in February, 1843; and why the residue of the principal and interest up to that date, with costs, should not be handed over by Frazier and Adams, agents, to the United States, or their proper officer, out of the cash funds deposited in the Bank of Louisiana; and why the other funds and property in the hands of said agents, and all property whatsoever within the jurisdiction of the court, heretofore attached, except a reasonable sum to pay the expenses of the agency, should not be declared free from all claims whatsoever of the United States, and be delivered to W. W. Frazier, agent of the assignees and intervenors aforesaid. But if the court should be of opinion that the assignees are not entitled to that relief, then why the said agents should not be ordered not to pay over any moneys to the United States, except the amount referred to in said agreement, to wit, the remainder of it, after deducting $251,243 50, with the interest; but to retain the property purchased by the United States under the execution, and all the cash, except that before mentioned, until the final adjudication of the matters in litigation in the Circuit Court in Pennsylvania, or the further order of the Commercial Court.

The plaintiffs appeared and excepted:

1st. That that part of the rule asking permission to carry into effect the judgment of the court affirmed by the Supreme Court, is useless and unnecessary, and presents no question for decision.

2nd. That the intervenors and defendants knew, when the rule was taken, the willingness of the plaintiffs to receive the portion of their judgment, which is not in dispute in the case in Pennsylvania, according to the agreement entered into; and that the said rule was not taken, from any apprehension of an execution being taken out for the whole amount of the judgment, but in fact to induce the plaintiffs to submit to its jurisdiction, or to obtain from the court a decision requiring them to submit to its jurisdiction, in relation to the agreement of which a copy is filed, and in relation to the assets purchased by the plaintiffs, through the agency of Frazier and Adams.

3d. That if the assignees have any rights or claims, either under the first agreement, or to the assets purchased by Frazier and Adams, they are not matters that can be investigated on a rule, but must be by petition; and further, that the court has no jurisdiction.

4th. That the rule states that Frazier and Adams are the joint agents of the government, when it was well known that Frazier had been removed as agent, and that Adams was the sole agent of the United States.

5th. That all the matters in controversy between the government and Frazier in relation to his agency, are pending in two suits in the Circuit Court of the United States, wherein all the questions will be settled.

For answer, in case the exception should be overruled, the plaintiffs say, they are willing to deduct, and have already entered on the execution taken in June, 1843, a credit for $126,000, being the amount of their purchases at the sheriff's sale; and also to deduct the sum of $251,243 54, with interest, the amount in controversy in Pennsylvania, letting it remain on deposit until said litigation is finished; and to receive the balance of their judgment out of the funds deposited, or to take an execution. They pray accordingly, and ask that Frazier and Adams be ordered to check on the Bank of Louisiana, for the sum due and interest.

Adams excepted to the form of the proceeding, and to the jurisdiction of the court.

Frazier answered, that divers persons, whose names are given,

have instituted suits in the courts named, against the Bank of the United States, and that some have caused notices to be served on him in his capacity of agent, and claim to be interested in the disposition of the funds in question. He prays that said parties may be cited to answer the rule. This request was granted, and a number of the parties were notified.

On the 13th of July 1844, after the cause had been tried, Frazier presented a supplemental answer, which the court permitted him to file. It was objected to, and a bill of exceptions taken, which will be noticed in the proper place.

The court below overruled all the exceptions, and proceeded with the trial. The assignees produced the agreement made in August, 1842, relative to the *remittitur;* also a record of a suit from the Circuit Court of the United States in Pennsylvania, showing a reversal of the judgment by the Supreme Court of the United States, in the case for the dividends and damages on the French bills; also the record of the first suit between the parties; and a number of documents, and the testimony of witnesses, to prove that Frazier was a trustee for all parties interested, and not an agent.

The district attorney relied on the judgment he had obtained against the bank. He produced the records of two suits in the Circuit Court of the United States in this city against Frazier, to recover the assets in his hands and damages; also the correspondence with the Solicitor of the Treasury; the proposals of Brooks, the attorney of the bank and the assignees; Frazier's various letters, and the order dismissing him; the list or description of the assets purchased by Frazier and Adams, as agents of the United States; also parol testimony to show the understanding relative to Frazier's appointment and duties.

In July, 1844, the court below gave a judgment, "that on receiving a re-transfer of the assets purchased by Frazier and Adams, agents of the United States, and on the United States discontinuing their suits against W. W. Frazier, and against Frazier and Adams, agents and others, at their own proper costs and charges, there be paid to the United States the amount of their judgment, less the sum of two hundred and fifty one thousand two hundred and forty three dollars, fifty cents; and that,

in consideration of this offer, all interest on said judgment shall cease from this date."* It was further ordered, that no execucution should issue without the special order of the court, and that the decree shall be binding on all the attaching creditors having orders of seizure on foreign judgments; and, finally, the court determined to hold the question of ordering a *remittitur* on the judgment under consideration, until the month of December, 1844. In that month, the judge, stated that he had suspended his opinion until that time, for the purpose of giving the district attorney an opportunity of consulting the Secretary of the Treasury as to whether any settlement could be made on the terms proposed by the judgment in July, and if not, whether or not the money on deposit cannot be invested in United States stock, or be in some other way made to produce interest, for the benefit of the parties; but as nothing had been proposed, the court decreed that a *remittitur* for $251,243 54, together with the interest thereon from the 20th of October, 1841, should be entered upon the judgment rendered in February, 1843, in favor of the United States against the Bank; it being proved that the judgment in the Circuit Court of the United States in Philadelphia had been reversed, and the record of that judgment being the only evidence on which the court below had given its judgment.

From the two judgments the plaintiffs have appealed.

Our attention will first be directed to the bills of exception.

The first is, to permitting W. W. Frazier to file what is called a supplemental answer about a week after the trial of the case had commenced, when all the evidence seems to have been received, and, in fact, on the very day the judge filed his reasons for his judgment. It was objected to as presented too late, and

---

* In assigning his reasons for this judgment, the judge of the court below says: " I am of opinion that the offer on the part of the assignees to pay the balance of the judgment of the United States, deducting the sum of $251,243 50, on receiving an assignment of the assets purchased by the agents of the United States, is reasonable and fair, and in consideration thereof, that all interest on that portion of the judgment of the United States should cease from this date. But this payment, and the right of the United States to receive any portion of this fund, is coupled with the condition that the United States discontinue their suits in the United States courts, at their proper cost and charges." &c. R.

because it had no connexion with the original answer, or the matters at issue. We think the court below erred in permitting this document to be filed. It was certainly too late. Every issue should be made, and all answers filed, before the trial commences. It must be an uncommon case, to justify the filing of an amendment, or supplement to the pleadings, during the trial; and after the evidence is finished, it cannot be permitted.

The plaintiffs second bill relating to the rejection of Smith as a witness, is not insisted on.

The counsel for the bank and the assignees, offered as evidence, to prove the reversal by the Supreme Court of the United States, of the judgment obtained by the United States against the Bank, in the Circuit Court in Pennsylvania, a printed copy of the record in the Supreme Court of the United States, certified by F. Hopkinson, as clerk of the Circuit Court of the United States for the Eastern District of Pennsylvania; attached to which is a copy of a mandate attested by the clerk of the Supreme Court, commanding said Circuit Court to take further proceedings in the case in conformity to the opinion and judgment of said Supreme Court, also certified by Hopkinson, but the opinion does not accompany it. The counsel for the plaintiffs objected to it, on the ground that it was not properly authenticated; and secondly, as being only a copy of a copy. The court below received it, and the plaintiffs attorney excepted. We are of opinion that the judge erred. The document is not properly certified. There is no certificate to it but that of F. Hopkinson, styling himself the clerk of the Circuit Court of the United States for the Eastern District of Pennsylvania, with the seal of his office attached. There is no evidence that he is the clerk, nor any such authentication as is required by the act of Congress. The counsel for the assignees contends that we are bound to know the clerks of all the United States courts, and to recognise their certificates as legal. He has not quoted any authority for such a position; and we are not aware that there is any law requiring the courts in this State, to give greater weight and authority to the certificates of the clerks of the United States courts in other States, than are to be given to the certificates and official acts of clerks of the State courts in the same State. It has been the practice

we believe, to recognise the official acts and certificates of the clerks of the United States courts in this State, and of the Supreme Court of the United States; but the practice is based more upon courtesy than positive provision. The judgment of the Supreme Court of the United States is not in this alleged record, and it does not disclose what that judgment is, any further than the recital of it in the mandamus states it.

Upon the question of jurisdiction, we have no hesitation in saying, that, under the agreement entered into in August, 1842, and upon legal principles also, the Commercial Court has jurisdiction of the question whether a *remittitur* shall be entered or not. But as there is no legal evidence to prove that the judgment in Pennsylvania has been reversed at all, we must say that the court was wrong in giving a judgment ordering the $251,243 54, with interest, to be remitted in the manner it has done.

As to the jurisdiction of the court over the United States, and Frazier and Adams, the agents appointed to purchase the assets, or a part of them, at the sale made in July, 1843, we should have no hesitation in saying, if the agents had not, in so many different ways submitted themselves to the court and recognised it, that the court would not have jurisdiction over any question arising out of the agreement to issue the execution, to purchase the assets, and to dispose of them after the proceeds are in hand. We consider that an independent and separate contract, to be enforced as to any rights the bank, or the assignees may have by virtue of it, not by a rule to show cause, but in the ordinary mode. All that the court should have done when execution was asked for under the agreement, was to have ordered it, and to have left the parties to take care of their own rights, whatever they were or may be. But the parties have so mixed up their proceedings, by rules, submissions and agreements, that it is extremely difficult to separate them from the original proceedings, or to say where the court should stop. If the question was *res nova*, we should say that the court was without jurisdiction to decide, in the present form of proceeding, upon the questions it has decided; but as the objection relates principally to the form of proceeding, we

have concluded that, so far as the present case goes, we will, under its peculiar circumstances, maintain the jurisdiction, and endeavor to place the parties in the position in which their agreements authorise them to stand.

Whilst the appeal in the case of the plaintiffs and defendants and intervenors was pending in this court, and it was uncertain in what way the case would be decided, there was great propriety in keeping the money and property in a situation to be restored to the assignees, in the event of the United States not succeeding in establishing their claim of priority on the property attached, or its proceeds. But now that their rights are settled and fixed to a large part of their demand, we cannot see the necessity or policy of keeping the money locked up, and letting interest accumulate on the debt, and the fund be exhausted, or much diminished by costs and allowances. If the case in Pennsylvania should be decided against the United States, it will not affect a portion of their demand at all; that is fixed and settled. If it be decided in their favor, then the judgment they have, with the right of priority, will cover the whole sum. Every consideration is in favor of settling as many difficulties as possible, and placing the parties in a situation where each will know its real rights.

When we examine all the circumstances of the case, the testimony before us, and the motives that prompted the consent to the sale in July, 1833, we see no sufficient grounds to sustain the position of the appellees, that Adams and Frazier, under their appointment as agents of the United States on the 7th June, 1843, were to hold the assets they might purchase at the sale to be made by the sheriff in July of that year, as trustees for the benefit of all concerned. Previously to this appointment, they held the property as receivers in the capacity alleged, that is, as far as the United States, the Bank and the assignees were concerned; but in June, 1843, the parties for whom they held ascertained that their interests would not be safe if the property continued in that situation. Other creditors of the Bank were pressing their claims; and, having obtained judgments, they were menacing the parties with forced sales under unpropitious circumstances, whereby the whole property was likely to be

sacrificed. It then became necessary to take some other ground; and, as the United States were an admitted and judgment creditor for a large amount, it was agreed to have a sale, at which the plaintiffs might bid, or not, as they pleased, the object being, first, to secure the debt, and, secondly, to make the property bring as much as possible. But we no where see it agreed or understood, that the United States should be bound to purchase the property, or any part of it, and to hold it for the benefit of the Bank, or the assignees. Such an agreement would imply, and be based upon collusion between the United States, the Bank and the assignees, whereby the government was, under the form of law, to become the purchaser of the property, hold it for the benefit of itself, the Bank or the assignees, and protect it, or them, from the pursuit of other creditors. Such an agreement would be simulated between the parties, and a fraud upon the other creditors. We cannot presume anything so unfair as this between the parties, and we find no evidence that will justify our coming to such a conclusion. The proposition of Brooks no where says, that if Adams and Frazier shall purchase any of the assets proposed to be sold, that they shall be held in trust, or for the benefit of the interested parties. The suits commenced, or to be brought, were not to be effected by the sale, nor was the United States to credit more on its judgment than it should realize from the assets purchased, nor is there any requirement that any balance should be paid over, in case such assets realized more than was owing. The proposition is, that there should be a sale—an open and public one, and not a collusive affair. Neither the Bank nor the assignees pretended to name an agent, nor to instruct or control Frazier and Adams, in any manner, as to how they should proceed, or what was to be done with the funds. They accepted the agency as agents of the United States. The Solicitor of the Treasury tells them to take charge of the assets they may purchase, and to hold them in trust for the United States; to proceed in the collection as fast as practicable, and to pay the money into the Treasury, in discharge of the debt, interest and costs; and that, when that should be paid, with the expenses

penses of the agency, to pay into court whatever sum may remain, for the benefit of whoever shall be entitled to it.

The counsel for the Bank and the assignees contends that the sale was a "conservative measure," and did not convey an absolute title to the United States for the assets purchased. Such does not seem to have been the idea of the Solicitor of the Treasury: he says that the agents are to hold the money in trust for the United States; and they accepted the agency, with those words plain and palpable in their act of procuration. If we believed that the sheriff's sale was a mere pretext, and a "conservative measure" to preserve the property from the pursuit of other creditors, and then to divide the money between the plaintiffs and the Bank or its assignees, we should at once tell the parties, as this court has told others on several occasions, that they must not call on us to enforce their simulated and fraudulent agreements. But we acquit the parties of all such purposes, and consider the sale, as it is presented to us now, as fair and legal.

In several of the rules and motions with which the record abounds, Adams and Frazier are called the agents of the United States; and in the case now before us they are so styled and proceeded against. They, in our opinion, hold the money and assets as such agents, and as such must account to their principals. If it had not been the intention of all parties to change the relations in which Adams and Frazier stood towards them, they might as well have continued their capacity as receivers. They then held as trustees for the benefit of all concerned; but that position not being safe, it became necessary to change it.

It appears to us that the judge of the Commercial Court labors under a misapprehension, as to the power and control he has over the agents appointed by parties to superintend their interests in the tribunal over which he presides. We have more than once said, that he has no right to appoint receivers and trustees, of his own accord and will, to take charge of money or property, unless in the cases pointed out by law. The law designates who the judicial sequestrator is, and the judge cannot name another, unless the parties agree to his doing so. They can select their own agents, and give them

such powers as they think proper; and the judge cannot impose burdens nor restrictions on such agents, other than those imposed by their principals. In the present case the Solicitor of the Treasury directed Adams and Frazier to take charge of the assets they might purchase; to collect the money as fast as possible, and pay it into the Treasury until the debt, interest and costs, and the expenses of the agency, should be paid; and the balance, if any, to pay into court, to whosoever may be entitled to it. Subsequently, the agents were directed not to pay the money into the Treasury, for reasons given, but to keep it on deposite to their own credit, so that it might be disposed of according to law, when the case in this court, and that in the Supreme Court of the United States, should be decided. The court, therefore, had no right to impose, and erred in imposing, restrictions upon the agents of the government, so as to embarrass the principals in disposing of their property. Nor has the Commercial Court any right or authority to control the United States in the appointment or discharge of its agent or agents, at their pleasure. Every principal has a right to select his own mandataries. Nor has it authority, when simply asked for process to enforce a judgment which the United States had obtained against the Bank, to impose such conditions as have been imposed in this case, and, in effect, enjoin the plaintiffs, without affidavit, or bond and security.

In conclusion, we are of opinion that all the assets purchased at the sheriff's sale made in July, 1843, by Frazier and Adams, as agents of the United States, belong to the United States; and that the proper officers of the government have a right to appoint agents to keep, collect and manage them, and such agents to remove at pleasure, without the consent of the Commercial Court. The government also has a right to appoint its own agent or agents to take care of the money received from the sheriff as the proceeds of the sale made in July, 1843; and also to remove said agent or agents. Therefore, we are of opinion that William W. Frazier, having been expressly discharged as an agent of the United States, can no longer act as such; and that Christopher Adams, junior, is now the sole

agent, subject to the orders of his principals, and that he must be relieved from the restraining orders of the court.

It is understood that no objection is made, on the part of the United States, to the sum of $251,243 54, with interest thereon at six per cent per annum, from the 20th day of October, 1841, until the day of its receipt by the sheriff, remaining on deposit, being returned to the assignees, or whoever shall be entitled to it, in case the suit of the United States against the Bank of the United States, in the Supreme Court of the United States at the date of the agreement made, in August, 1842, be decided in favor of the Bank; and as to the balance of their claim, the plaintiffs are entitled to it, and no objection is made on the part of the assignees of the Bank to its being paid; but they wish to take the assets purchased by the United States at the sheriff's sale, to which we think they have no right.

It is, therefore, adjudged and decreed, that the judgments appealed from be annulled and reversed; and proceeding to give such judgment as, in our opinion, should have been given in the court below, it is ordered and decreed, that there be deducted from the judgment in favor of the United States the sum credited on the execution, in July, 1843, as the amount of the purchases made at the sheriff's sale, to wit, the sum of one hundred and twenty-six thousand dollars; and that the sum of three hundred and sixty-five thousand one hundred and nineteen dollars and eighteen cents, on deposit in the Bank of Louisiana, stand to the credit of Christopher Adams, junior, as sole agent of the United States, out of which he will retain the sum of two hundred and fifty-one thousand two hundred and forty-three dollars and fifty-four cents, with interest, at six per cent per annum, from the 20th day of February,* 1841, until said sum was received by the sheriff, in July, 1843: said sum to be returned to the said assignees of the Bank of the United States, or whoever else may be entitled to it, whenever said Bank, or the assignees, shall establish, in a legal manner, that the aforesaid judgment in favor of the United States against the Bank of the United States has been reversed; the balance on deposit in

* *Sic* in MSS.

said Bank of Louisiana to be disposed of by the said Christopher Adams, junior, in such manner as his principals may direct. The said Bank of the United States, and the assignees thereof, to pay the costs of the proceedings in the court below on the rule, and also the costs of this appeal. And it is further ordered, that this judgment be without prejudice to whatever rights the said assignees may have to any surplus, if any there should be, in the realization of the assets purchased by said agents over and above the amount at which the same were adjudicated at the sheriff's sale, to wit, the sum of $126,000; which rights, whatever the same may be, are reserved to the said assignees. This reservation not to be taken as interfering with the title of the United States to the assets purchased by them, or their right to collect the same and apply the proceeds, as stated in the letter of the Solicitor of the Treasury, dated June 7th, 1843, addressed to Messrs. W. W. Frazier and C. Adams, junior, wherein he directs them to assume the care, management and collection of such assets and *choses in action* as they may purchase, and in what manner they shall apply the proceeds of the same.

*Peyton*, District Attorney of the United States, for the appellants. *I. W. Smith*, on the same side.

*T. Slidell*, for the defendants.